STATE OF NORTH CAROLINA v. STEVIE OXENDINE

No. 591PA87

(Filed 6 December 1991)

### 1. Criminal Law § 460 (NCI4th) — murder — closing argument — permissible inference

The prosecutor's argument in a murder prosecution that the deceased was afraid of the defendant, that she had been the victim of physical threats and torture, and on one occasion had been beaten with a shoe was a proper argument where there was testimony that the defendant had hit the deceased with a shoe and had beaten and threatened her. This would support an inference that she was afraid of him.

**Am Jur 2d, Homicide § 463; Trial § 260.**

### 2. Criminal Law § 460 (NCI4th) — murder — closing argument — not grossly improper

A prosecutor's closing argument in a murder prosecution was not so grossly improper as to require the trial court to intervene *ex mero motu* where the prosecutor argued that the deceased was working to get enough money to have the lights turned back on and that defendant blew her head off.

STATE v. OXENDINE

[330 N.C. 419 (1991)]

There was evidence that defendant and his wife had argued over the light bill, but no evidence that the electricity had been turned off, and there was evidence that defendant shot her in the head, but no evidence that he shot her head off.

**Am Jur 2d, Homicide § 463; Trial § 260.**

**3. Criminal Law § 460 (NCI4th) — murder — closing argument — deceased's feelings**

The prosecutor's closing argument in a murder prosecution was not so grossly improper as to require intervention *ex mero motu* where the prosecutor argued that the deceased had said "I'd rather be dead than live another night in that house with him" after the court had excluded testimony to that effect at trial. The prosecuting attorney may have exaggerated the deceased's feelings, but it is a reasonable inference that she did not want to live any longer with the defendant.

**Am Jur 2d, Homicide § 463; Trial §§ 253, 260.**

**4. Criminal Law § 468 (NCI4th) — murder — closing argument — attitude of defendant toward victim**

The prosecutor's argument in a murder prosecution that defendant had for the victim a possessive, clinging, hating love which caused him to kill her was proper.

**Am Jur 2d, Homicide § 463; Trial § 218.**

**5. Criminal Law § 460 (NCI4th) — murder — closing argument — defendant's self-inflicted wound**

The prosecutor properly argued in a murder trial that defendant did not intend to kill himself when he shot himself in the stomach after shooting the victim in the head, and that he shot himself and wrote a letter to create sympathy for himself. There was testimony by a witness that she saw defendant pointing the pistol towards the area of his stomach, and the evidence was undisputed that the wound of the defendant's wife was fatal and that the wound of defendant was not fatal. This would support the inference that defendant did not intend to kill himself, and, if that be the case, it could be inferred that the letter was written to create sympathy.

**Am Jur 2d, Homicide § 463; Trial § 260.**

ON writ of certiorari to review a judgment imposing a life sentence by *Britt, J.*, at the 9 September 1986 Criminal Session of Superior Court, ROBESON County, upon a jury verdict of guilty of first degree murder. Heard in the Supreme Court 14 February 1991.

The defendant was tried for the first degree murder of his wife. The prosecuting attorney announced before the trial commenced that there was not sufficient evidence to seek the death penalty. The defendant was not tried for his life.

The State's evidence tended to show that the marriage of the defendant and his wife had deteriorated. Linda Sue Locklear, the deceased's first cousin, testified that the defendant called her and told her his wife had left him. The defendant asked Ms. Locklear to call his wife and ask her to return to him. Ms. Locklear testified she had seen the defendant threaten his wife many times, including a threat to drag her behind his car and to maim her so that no one else would want her. She testified that on one occasion the defendant came to her house to get his wife. The defendant told his wife, on that occasion, that she belonged to him and he would take her home with him. He tried to pick her up and put her in his car against her will.

Brenda Gail Butler testified that she was the twin sister of the deceased. She testified that the defendant came to her home a few days before the deceased was killed and said his wife "told me to get back across the field." Mrs. Butler testified that the defendant then said, "there was gonna be a lot more people hurt, worse than he was hurtin. . . . And when [they] found them, they was gonna be found together." She also testified she had heard the defendant threaten his wife many times.

Wilbur Lee Butler, the husband of Brenda Gail Butler, testified that the defendant came to his house the day before the defendant's wife was killed. Mr. Butler testified that the defendant told him he had been waiting a week for his wife to come home. Mr. Butler told the defendant to give his wife a little more time and she would come back to him. The defendant told him he could not wait another twenty-four hours.

Jamie Oxendine, the defendant's fourteen year old son, testified he had heard his father threaten to kill his mother a "bunch" of times. He testified that he heard his father threaten his mother

when they were arguing about the light bill. On one occasion, his father hit his mother with her tennis shoe hard enough to leave a bruise.

There was further evidence that the defendant borrowed a pistol and shot his wife to death in the parking lot of her place of employment, after which he shot himself. The wound of the defendant was not fatal. A letter from the defendant written to Mr. and Mrs. Butler before the shooting was introduced into evidence. In this letter the defendant said he loved his wife very much and could not live without her. He intimated he would kill his wife and commit suicide.

The jury found the defendant guilty of first degree murder and he was sentenced to life in prison. The defendant appealed.

*Lacy H. Thornburg, Attorney General, by G. Lawrence Reeves, Assistant Attorney General, for the State.*

*Malcolm Ray Hunter, Jr., Appellate Defender, by M. Patricia Devine, Assistant Appellate Defender, for defendant appellant.*

WEBB, Justice.

The defendant's only assignment of error deals with the prosecuting attorney's argument to the jury, which the defendant contends "exceeded the bounds of the relevant statutes in ways sufficiently numerous and egregious to infringe on defendant's right to a fair trial at the hands of an unprejudiced jury." *See* N.C.G.S. § 15A-1230 (1988). The defendant objected to only one part of the argument of the prosecuting attorney. For those parts of the argument to which he did not object and now assigns error, we must review them to determine whether they were so grossly improper that the trial court abused its discretion in failing to intervene *ex mero motu* to correct the error. *State v. Jones,* 317 N.C. 487, 346 S.E.2d 657 (1986).

[1] The prosecutor argued to the jury that the deceased was afraid of the defendant, that she had been the victim of physical threats and torture and on one occasion she had been beaten with a shoe. The defendant says this was an improper argument. There was testimony that the defendant had hit the deceased with a shoe. There was also testimony that the defendant had beaten the deceased and had threatened her. This would support an inference

that she was afraid of him. This argument was properly made. *State v. Williams*, 317 N.C. 474, 346 S.E.2d 405 (1986).

[2] The defendant also argues that it was improper for the prosecuting attorney to argue that the deceased was working because she was "trying to get enough money to get the lights cut back on" and "he got out [of the truck] in the most cowardly way and went over there and put a gun straight to her head and blew her head off." There was evidence that the defendant and his wife had argued over the light bill, although there was not evidence that the electricity had been cut off. There was evidence that the defendant had left his truck and walked over to his wife and shot her in the head, although there was not evidence that he had shot her head off. There was no objection to these arguments and they were not so grossly improper that the court should have intervened *ex mero motu*.

[3] The defendant next contends it was error for the prosecuting attorney to argue that the defendant's wife had said "I'd rather be dead than live another night in that house with him." The court had excluded testimony to this effect at the trial. Again there was no objection to this argument by the defense attorney. The prosecuting attorney may have exaggerated the deceased's feelings, but it is a reasonable inference that she did not want to live any longer with the defendant. This statement was not so grossly improper that the court should have intervened *ex mero motu*.

[4] The defendant next says that in arguing the element of malice in the law of homicide, the prosecuting attorney made "a dangerous and unauthorized detour into psychology and/or religion for impressionable jurors." The prosecuting attorney argued to the jury that the attitude of the defendant towards his wife, which included "meanness, hate, possessiveness, wanting to control, wanting to stifle another human being, wanting to own her, wanting to make sure no one else has her," constituted malice. He then argued that in biblical times the Greeks had more than one word for love. There was agape which was a selfless love which makes one look out for his fellow man. There was eros which was love based on the physical attraction of a woman for a man. The prosecuting attorney argued there could be a dark side to this type of love and cause a man to lose his normal judgment. He argued that this could develop into "possessive, clinging, hating love." The pros-

ecuting attorney said this was the type love the defendant had for his wife and it caused him to kill her.

The defendant did not object to this argument. We hold it was not erroneous. The qualities which the prosecuting attorney said constituted malice were examples of matters that would be hatred or ill will, which is malice under the law of homicide. *State v. Foust*, 258 N.C. 453, 128 S.E.2d 889 (1963). The argument as to eros as a type of love that has a dark side and can cause a person to kill was based on common knowledge and experience. It was a proper argument.

[5] In his last argument, the defendant says that the prosecuting attorney invited the jury to speculate on the motive of the defendant in inflicting a wound on himself. This is the only part of the State's argument to the jury to which the defendant objected.

The prosecuting attorney argued to the jury that the defendant did not intend to kill himself. He argued that the defendant shot his wife in the head, knowing a wound so inflicted would be fatal, and then shot himself in the stomach. If he had intended to kill himself, he would have shot himself in the head. The defendant's shooting himself, said the prosecuting attorney, was intended to create sympathy as was the letter he wrote to Mr. and Mrs. Butler. The defendant argues there was no evidence that the defendant shot himself in the stomach and that "the reasonable inference to be drawn from the [letter was] that he intended to kill both himself and his wife."

As to the defendant's argument that there was no evidence that the defendant shot himself in the stomach, there was testimony by a witness that she saw the defendant pointing the pistol towards the area of his stomach. The evidence was undisputed that the wound of the defendant's wife was fatal and the wound of the defendant was not. This would support the inference for which the prosecuting attorney argued, that the defendant did not intend to kill himself. If this be the case, it could be inferred the letter was written by the defendant to create sympathy for himself. We hold that this was a proper argument.

The defendant's assignment of error is overruled.

No error.